**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KAYLA W., by and through her | : | |
| Parent, CATRINA J., | : | |
| of Drexel Hill, PA, | : | |
| | : | Civil Action |
| Plaintiff | : | |
| | : | |
| v. | : | No. |
| | : | |
| CHICHESTER SCHOOL DISTRICT, | : | |
| 401 Cherry Tree Road | : | |
| Aston, PA 19014, | : | |
| | : | |
| Defendant | : | |

## COMPLAINT

### I.    Preliminary Statement

1.     This action is brought by Kayla W. ("Kayla"), a minor child with disabilities, by and through her Parent, Catrina J. ("Parent") (collectively referred to as the "Family"), against Defendant, Chichester School District (the "District"), in Aston, Pennsylvania, under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq.; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; their federal and state implementing regulations; and Chapters 14 and 15 of the Pennsylvania Code.

2.     Kayla was denied the Free and Appropriate Public Education ("FAPE") to which she was entitled while a student in the District during the 2016-2017 school year and first part of the 2017-2018 school year, in fifth and sixth grades. Thereafter, the Family moved to a nearby district in Upper Darby, Pennsylvania, where she was appropriately identified and, as a result, provided an Individualized Education Program ("IEP"). There were clear reasons the District should have suspected under IDEA and Section 504 that Kayla was disabled. It should have

evaluated and identified her as a child with disabilities while she was enrolled. As a result of its failure to do so, Kayla failed her core academic subjects, struggled mightily with peer and staff relationships, received punishments including disciplinary exclusions from school, removals from instructional settings, and denials of and access to activities, and ultimately was referred for possible expulsion from school as a result of a June, 2017 incident.

3.      The Upper Darby School District ("UDSD"), where Kayla has attended school since February of 2018, subsequently identified her as disabled, finding her eligible under IDEA as a child with a Specific Learning Disability ("SLD") who requires Specially Designed Instruction ("SDI") in math (computation and problem solving) and written expression. UDSD provides Kayla with other educational accommodations including an individualized Behavior Support Plan ("BSP") and a plan for attendance, due to her behavioral/emotional issues including attention problems, learning problems, adaptability, executive functioning, and self-resiliency.

4.      Before arriving in the District, Kayla attended a small, private school. She had a difficult transition to public school, where she was placed in larger classes than she was used to and was moved from class to class in a middle-school setting for the first time. Although the District knew of her escalating struggles, despite clearly demonstrated behavioral, emotional, and academic needs and deficits, the District failed to timely and appropriately evaluate and identify Kayla as a child with disabilities and provide her with an appropriate special education program, placement and accommodations, resulting in Kayla's persistent failure to make meaningful educational progress while she was enrolled there.

5.      During her time in the District, Kayla exhibited declining and failing grades, despite what appeared to be average abilities. Testimony at the administrative due process hearing demonstrated that teachers recognized Kayla used various and escalating misbehaviors to avoid

2

school and schoolwork, including tardiness, sleeping in class, and disrespect. Kayla underwent many disciplinary punishments for these behaviors, almost all of which removed her from instruction. Her misbehaviors grew worse with these punishments. In contrast, teachers noted that she responded well when they provided meaningful interventions, such as tutoring her one-on-one in subjects she found difficult. At team meetings, teachers and an administrator discussed the need to evaluate her for disability. However, for inexplicable reasons, the District failed to evaluate Kayla. As the Local Educational Agency ("LEA"), it failed to provide positive academic and behavioral interventions, as stipulated at the hearing.

6.     During the 2016-2017 school year, Parent was, as the District knew, fully occupied by the dire medical situation of Kayla's brother, Sharif. He had a virulent strain of leukemia and was being treated at the Nemours DuPont Children's Hospital in Delaware, a significant distance from the Family's home. (Sharif has since died.) Parent, who did not and does not drive, would take him for what was supposed to be outpatient treatment; however, due to his serious reactions to chemotherapy, they frequently could not return that day. Parent would be required to stay with him for multiple days in the Intensive Care Unit. During one such stay, in March of 2017, Parent received another phone call from the District notifying her that Kayla was again being suspended. Because this pattern of discipline was now clear, Parent discussed with the District what could be done to help Kayla given her behavioral and academic struggles, and Parent affirmatively requested that the District evaluate Kayla for possible disabilities.

7.     In utter disregard for the Family's chaotic situation, the District did not issue the usual Permission to Evaluate ("PTE") form for Parent to sign. Instead, in March, it issued a bizarre and ridiculously bureaucratic form seeking her signature on what amounted to a "Permission to Issue a Permission to Evaluate" ("PTIPTE") form – in effect, asking her  permission for the

District to ask for her permission to evaluate Kayla, and demanding that she sign first this PTIPTE form, and only later to sign the proper (and typical) PTE form, before the District would evaluate.

8.      Testimony and evidence showed that Parent did not receive this unnecessary and extralegal PTIPTE form in March. The District underwent massive personnel changes that year and presented nothing demonstrating this bizarre form was even sent in March. It never produced a letter, email or even a telephone log reflecting that it discussed it with Parent. Instead of following up promptly as required per Parent's evaluation request, it waited *two months* to email it to her. By then, even further overwhelmed with her son's care, essentially living with him in the hospital as he worsened, and relying on relatives to care for Kayla, Parent did not return the unnecessary PTIPTE form. The District did not follow up, despite being aware of Parent's circumstances and evaluation request. It neither sent a proper PTE nor pursued a due process hearing to complete the evaluation she requested -- though it legally could and should have done so given these circumstances. However, the school psychologist (who then left the District's employ), perhaps expecting it to issue a timely PTE, completed a classroom observation of Kayla, which alarmingly showed she was not on task for an extraordinarily high percentage of time compared to her peers.

9.      Meanwhile, Kayla's struggles with school continued to escalate. On the Spring 2017 PSSAs, she scored in the "Below Basic" (lowest) range in Math, and "Basic" (low) in Reading. She exhibited more avoidance, defiance and aggression, and her grades and problematic behaviors worsened. She underwent further rounds of punishment, exclusions from school, removals from class, denials of activities, and incurred at least 12 days of out-of-school suspension before June, depriving her of the instruction she so desperately needed.

10.     At the end of her fifth-grade school year, in June of 2017, Kayla was involved in a physical altercation with a male peer. A teacher attempted to intervene. Kayla allegedly struck her

but did not cause injury. She was punished with five more days of out-of-school suspension.

11.     In mid-August, given her prior infractions, at a "pre-expulsion" meeting, the District told Parent she had a "choice": either Parent could finally receive and sign a PTE form for Kayla's evaluation, but only if Parent would agree to a long-term IDEA/Section 504 "diagnostic placement" in the Delaware County Intermediate Unit ("DCIU") Pennington Center, **plus** a lengthy "waiver" form (that she was not allowed to meaningfully review, and which is void and unenforceable, as well as against public policy), or the District would expel Kayla entirely for the 2017-2018 school year, providing her with no public school education.

12.     That was the District's response, five months later, to Parent's request for an evaluation in March, and to Kayla's escalating difficulties, including the behavioral incident at the end of the school year (and with no meaningful choice offered). Parent signed the forms that day.

13.     Kayla therefore commenced the 2017-2018 school year at DCIU's Pennington Center, which she attended until November. As Kayla and Parent found out upon their initial tour, this program is for children whose emotional and behavioral needs are so severe that they cannot attend a neighborhood school. Kayla finally began to receive meaningful support: she was placed in a full-time, self-contained, special-education classroom, with a maximum of six students and an extraordinarily high level of personnel support: a full-time certified special-education classroom teacher, a full-time classroom assistant/aide, a student teacher, and a social worker. She and all other students had group and individual counseling regularly. Upon Kayla's intake, the program's psychiatrist evaluated her, examined her educational records from the District, and found she had mixed adjustment disorder. In that small and full-time special-education setting, which did not replicate her educational setting in the District, with such a high level of support, and with her no longer having to move from class to class except for lunch and physical education, Kayla did well.

As the only girl in her small classroom, she encountered social difficulties, but her problematic behaviors diminished significantly, and she achieved passing grades.

14.     Thereafter, a school psychologist at DCIU initiated the process of evaluating Kayla for IDEA/Section 504 eligibility. Unbelievably, the DCIU's October Evaluation Report ("ER") found Kayla ineligible for special education services despite the many notable concerns regarding her social/emotional functioning, challenges with executive function skills, and extremely poor academic performance in the District's regularly-sized public school classroom. This psychologist apparently did not examine the District's records, but relied only upon the DCIU Pennington classroom's, and did not take into account the smaller setting, with an extraordinarily high level of support, in which her and the teachers' observations occurred – or Kayla's clear struggles with larger classroom settings, and moving from class to class, that she was no longer encountering.

15.     After the DCIU ER found Kayla not eligible under IDEA and Section 504, the District adopted the findings but held no team meeting. The District did not issue a Notice of Recommended Educational Placement ("NOREP"). Parent was not provided a copy of the ER until December 2017. Instead, Parent was simply told that Kayla should return to the District.

16.     Approximately simultaneously, however, at the written insistence of Sharif's Nemours/DuPont cancer specialists, the Family was forced to leave the home it rented under Section 8 of the Housing Act of 1937, 42 U.S.C. § 1437 (the Housing Choice Voucher Program), due to environmental conditions that were unsafe for him in his fragile state, including mold and an insect infestation. The Family temporarily split up and stayed in the homes of nearby relatives in neighboring school districts, while seeking suitable, stable housing. During this time, Kayla's mother discussed with the District the family's temporary home instability and desire for Kayla to return to the District for the sake of consistency during this medical crisis. Regardless, and in

6

violation of the McKinney-Vento Act, the District would not allow Kayla to remain in her educational program. It heartlessly dis-enrolled the children and prohibited them from attending school based on non-residency. The Family eventually found suitable housing in the UDSD.

17.     Kayla's Parent then filed an administrative Due Process Complaint with the Pennsylvania Office for Dispute Resolution ("ODR") seeking, inter alia, full days of equitable compensatory education to be used for appropriate educational and vocational services for Kayla.

18.     Following a three-day evidentiary hearing, the presiding Hearing Officer denied relief in a Decision dated September 3, 2020, a copy of which is in the administrative record.

19.     The Decision contains plain, egregious errors of law and fact. This Court should reverse and award appropriate relief to the Family for the District's educational failures, i.e., full days of compensatory education for the District's violations of IDEA and Section 504 for the entire time she was enrolled in the District, and reasonable attorneys' fees and costs.

20.     This Court is required to undertake an independent review of the record and Hearing Officer's Decision. 20 U.S.C. § 1415(e)(2); Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206-07 (1982); Susan N. v. Wilson School Dist., 70 F.3d 751, 757-58 (3d Cir. 1995). After fully considering the entire record, this Court should reverse the Hearing Officer's incorrect decision.

## II.     Parties

21.     Kayla was born in 2005, and resided in Trainer, Pennsylvania, within the geographical boundaries of the District, at all times relevant to this complaint. She now resides in Drexel Hill, Pennsylvania. She is a student with multiple diagnosed disabilities as defined under IDEA and is also a protected handicapped student under Section 504.

22.     Catrina J. is Kayla's mother. At all times relevant to this action, she resided with

Kayla in Trainer, Pennsylvania. She now resides in Drexel Hill, Pennsylvania, with Kayla.

23.     The District is located at 401 Cherry Tree Road, Aston, Pennsylvania. It is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries. Such services include those mandated under IDEA as well as Pennsylvania's statutory/regulatory scheme concerning young children with disabilities. 11 P.S. § 875-101; 22 Pa. Code §§ 14.131 - 14.133; see also, e.g., 24 P.S. Chapter 13; and 22 Pa. Code Chapters 14 and 15.

**III.    Jurisdiction and Venue**

24.     This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA and Section 504.

25.     Plaintiffs have exhausted their administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued a Special Education Due Process hearing.

26.     Plaintiffs' claims and remedies are authorized by 20 U.S.C. § 1415, and 28 U.S.C. §§ 2201 and 2202, providing for declaratory and any further relief deemed necessary and proper.

27.     All the Defendant's actions complained of herein have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

**IV.    Additional Facts Supporting Liability**

28.     Kayla W. is a student with necessary school-based support in math, writing and behavior. UDSD, Kayla's current school district, identified her and found her eligible under IDEA in the Fall of 2019 as a child with a Specific Learning Disability ("SLD") in math (computation and problem solving) and written expression, and also found she exhibits difficulties with

"attention problems, learning problems, adaptability, executive functioning, and self-resiliency". UDSD found that to make progress, Kayla requires an IEP with Specially Designed Instruction ("SDI") in the areas of math and written expression, and further needs other educational accommodations for her behavioral and emotional needs including an individualized BSP and a plan for attendance.[1]

29.     Unfortunately, when Kayla was a fifth-grade student in the District in the 2016-2017 school year and a sixth-grade student during the first part of the 2017-2018 school year, the District failed to act on the clear signs of her disabilities. As stipulated at the hearing, it deliberately and completely failed to provide positive academic and behavioral interventions during that time. As a result, Kayla failed her core academic subjects, struggled with and failed in peer and staff relationships, and received punishments including disciplinary exclusions from school, removals from instructional settings, and denials of and access to activities, while a student in the District.[2]

30.     During Kayla's protracted period of clear academic and behavioral struggles in the 2016-2017 school year, the District did not issue a PTE form. The District took no steps itself to consider whether Kayla was eligible under IDEA or Section 504 until June, just before the end of

---

[1] The UDSD's ER that conferred IDEA eligibility reflects the input and recommendations of five teachers; local assessment data; grades and specific class performance; assessment by a school psychologist; input from the nurse; and review of records. In other words, in sharp contrast to the ER by which the District and its IU found Kayla ineligible, it is a comprehensive team evaluation.

[2] Kayla's academic struggles predated her 2016-2017 school-year enrollment in the District, placing it on actual notice of her disabilities. The District's records reflect that in her fourth-grade school year, she exhibited clear indicators of math issues (e.g., she had no higher than a 18.3% likelihood of reaching proficiency). Once the District placed her in a special education setting, she did much better -- but it incredibly found her ineligible and returned her to regular education, where, albeit in a different district, she again struggled until properly found eligible.

the school year. Although teachers brought up evaluating Kayla in internal undocumented "team meetings" that the middle-school vice-principal, Susan Gavigan, also attended, Ms. Gavigan did not see cause for concern; instead, as she testified, she found Kayla's documented struggles a source of amusement.

31.     Nor did the District take any steps on its own to complete an evaluation when it did not receive back the signed PTIPTE form it sent to Parent upon her request for an evaluation in March of 2017 when, as the District knew, Parent was overwhelmed with the care of her son in a hospital in another state. However, under the circumstances, it could and should have taken steps, including a due process hearing, if necessary, to obtain authority to evaluate, even beyond the PTE form it should have issued.   Parent – having asked for an evaluation – would clearly have provided consent on a properly issued PTE, contrary to the Hearing Officer's remarkable and unsupported finding that had the District properly issued a PTE and provided it to Parent, she would not have signed it.

32.     It was not until June 15, 2017, however, that the District decided Kayla was a student for whom eligibility should be considered. A single event on June 8, 2017 appears to have triggered the belated and partial IDEA response by the District when, during an altercation between Kayla and a student, a teacher intervened and was slapped.[3] Days after the incident and following the imposition of two days of out-of-school suspension, the District commenced a "pre-expulsion" process on June 12, 2017 through an internal memo to the Superintendent. Kayla

_____

[3] Counsel for the Family in no way diminishes the incident involving the teacher, Ms. Hess. However, there is no evidence of record that she was injured. Nor is there evidence that if the District had properly classified Kayla as "thought to be eligible" under IDEA or Section 504, as it should have, that this incident was so serious as to support transfer to a 45-day interim alternative educational setting.

was then suspended for an additional three days. On June 15, 2017, after imposing 16 days of out-of-school suspension plus countless other punishments and discipline on Kayla, the District completed a referral to a multi-disciplinary team ("MDT"). Although the special education administrator received that referral, the District *still* did not issue the mandated PTE at that time.[4]

33.     The District did not issue a PTE until August 15, 2017. That PTE was issued for reasons other than Kayla's needs:

- On August 15, 2017, Kayla would be expelled from education unless Parent agreed to Kayla's being removed from the middle school;

- Kayla would only have access to the IDEA/Section 504 evaluation process if she were removed from the middle school and placed in an alternative program via the DCIU;

- The only option for Kayla to continue education in September 2017 was through a placement by the District in the DCIU program; and

- Avoiding an expulsion and obtaining an IDEA/Section 504 evaluation required Parent to sign a "waiver" document prepared by the District which she was not entitled to meaningfully review and which contained obvious errors, such as the meeting date, that she would have corrected had she been able to review it in full.[5]

---

[4] Given the testimony that teachers expressed concerns in team meetings with an administrator, Kayla should have been considered a "thought-to-be-eligible" student under IDEA and/or Section 504 well before June 2017. Had the District properly issued a PTE in June 2017, it would have acknowledged that Kayla was, from its perspective, a child suspected of having a disability. Such an acknowledgement would have prevented the District from convening its pre-expulsion meeting with Parent two months later, on August 15, 2017.

[5] While public policy considerations alone should negate any import of the "Waiver" prepared by the District, its complete lack of specificity as to explicit IDEA and Section 504 rights and entitlements as well as the lack of requisite consideration render it void and unenforceable.

34.     Just as the PITPTE/PTE issuance and the District's forcing Kayla to move to the DCIU to be evaluated were replete with problems, so, too, was the ensuing ER. The District required placement in the DCIU program -- a disciplinary move to a setting that in no way mirrored (or even closely resembled) the regular education placement from whence Kayla came. Compounding this move that the District required was its undertaking the evaluation within that small, high-support-level, special-education setting – and without any meaningful connection to, or communication with, her 2016-2017 year-long general education team at the District. The IU psychologist did not request the existing and extensive data from the regular school setting at the District, nor did the District provide it. The psychologist did not request input from Kayla's District teachers, the vice-principal, or a counselor, all of whom had first-hand knowledge of her academic performance in the classroom, the strategies they had employed, her particular behavioral challenges with peers and adults, and the environments and circumstances where her behaviors occurred (but were not occurring at the DCIU). Nor did the District provide it. The psychologist did not review or request the earlier observation of Kayla in the general education setting at the District by its former psychologist, and the District did not provide it. The most elementary comparison between how Kayla reacted to the small setting of both her private religious classroom with much support and her DCIU special education classroom with an extraordinarily high level of support (in both of which she did well and exhibited a low level of difficulty and behavioral issues), versus the District's typically large classrooms and moving from class to class with a low level of support (in which she did poorly and exhibited a high level of difficulty and behavioral issues), would have revealed that Kayla responded well to a special education setting and did not respond well to a regular education setting – which plainly indicates the presence of one or more disabilities. But neither the District nor the DCIU performed such a

comparison. Nor did the Hearing Officer.

35.     Finally, the District decided to accept the DCIU psychologist's October 13, 2017 non-eligibility finding – that of a single individual – **without** convening the required meeting of the MDT, thus foreclosing any opportunity for District staff with Kayla's 2016-2017 information to contribute to her eligibility determination.

36.     Moreover, there is no evidence that the District or the IU provided the ER to Parent at any time before December 2017, and the District did not issue a NOREP with its non-eligibility finding.

37.     After a period of homelessness (staying with relatives in two locations due to space constraints) between November of 2017 and February of 2018, Kayla and her family relocated to the UDSD. Due to her continued concerns with Kayla's academic performance and Kayla's struggles in the new environment, Parent requested that the UDSD conduct an evaluation to determine Kayla's need for an IEP. The UDSD October 25, 2019 ER includes numerous concerns from teachers regarding Kayla's academic performance (reading, language arts, math, and social studies); attention to tasks; organization; assignment completion; and compliance.

38.     The UDSD psychologist administered the fifth edition of the Wechsler Intelligence Scale for Children ("WISC-V") to determine Kayla's cognitive functioning and reported scores in the average range.

39.     The UDSD psychologist obtained Kayla's achievement scores using subtests from the third edition of the Kaufman Test of Educational Achievement ("KTEA-III") and the third edition of the Wechsler Individual Achievement Test ("WIAT-III"). These reflected numerous scores below her cognitive ability, including in Nonsense Word Decoding; Letter Word Recognition; Reading Comprehension; Silent Reading Fluency; Written Expression; Oral

Discourse Comprehension; Spelling; Math Computation; and Math Concepts and Application (SS 81). Her Wechsler Individual Achievement Test also reflected achievement below her cognitive ability in Oral Reading Fluency; Math Fluency Addition; Math Fluency Subtraction; and Math Fluency Multiplication.

40.     Kayla's Parent and her teachers completed Behavior Assessment System for Children, Third Edition ("BASC-3") rating scales on Kayla's social/emotional functioning. Kayla's Parent reported numerous "At-Risk" scores including: hyperactivity; internalizing problems; attention problems; adaptability; emotional self-control; executive functioning; and resiliency. Kayla's math teacher reported "Clinically Significant" scores in school problems; attention problems; learning problems; adaptive skills; adaptability; social skills; leadership skills; developmental social disorders and resiliency. Her math teacher also noted "At-Risk" scores in externalizing problems; hyperactivity; aggression; conduct problems; behavioral symptoms index; withdrawal; study skills; functional communication; anger control; bullying; executive functioning; and negative emotionality. Similarly, Kayla's language-arts teacher reported "Clinically Significant" scores in school problems and attention problems and "At-Risk" scores in learning problems; adaptive skills; adaptability; social skills; leadership; study skills; functional communication; developmental social disorders; executive functioning; and resiliency.

41.     The UDSD psychologist utilized the "Conners-3" rating scales to determine the presence of Kayla's ADHD characteristics. Kayla's mother noted "Clinically Significant" concerns with learning problems and executive functioning and "At-Risk" scores in hyperactivity/impulsivity and peer relations. Kayla's math and language-arts teachers reported "Clinically Significant" scores for inattention and learning problems. The language-arts teacher also scored Kayla as "Clinically Significant" in defiance/aggression "At-Risk" in

14

hyperactivity/impulsivity.

42.     Kayla's math teacher also noted elevation indicative of Emotional Disturbance due to poor task completion, distraction, and attention on the Scales for Assessing Emotional Disturbance-II.

43.     The UDSD completed a Functional Behavioral Assessment ("FBA") as part of its October 2019 ER to determine the function of the following of Kayla's problem behaviors: work refusal and off-task behavior. The FBA concluded the function of these behaviors is to escape demands.

44.     In its October 2019 ER, the UDSD determined Kayla was eligible for an IEP under the primary disability category of SLD and recommended BSP to support her challenges with attention and task completion.

45.     The UDSD has implemented that and provides Kayla special education support and a PBSP. She receives individualized support to address her academic deficits across subject areas and behavior: math computations in multiplication and division; math fluency; writing; and positive behavior support to address her noncompliant and off-task behaviors.

46.     After the UDSD found Kayla eligible for an IEP, the Family filed a due process administrative complaint. Following a three-day evidentiary hearing, the presiding Hearing Officer, Cathy A. Skidmore, Esquire, issued a factually and legally erroneous written decision and order, denying all relief to Kayla and the Family. ODR No. 23543-19-20 (September 3, 2020) ("Decision"). Notes of Testimony (N.T., i.e., transcripts) of all the sessions, numbered consecutively, are in the Administrative Record certified to this Court.

47.     The Decision was incorrect in a plethora of ways. It should be reversed by this Court, and appropriate relief should be awarded to the Family.

## V.   **Legal Authority**

48.   The purpose of the IDEA is to ensure that "all children with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); see Endrew F. v. Douglas County School Dist. RE-1, 137 S. Ct. 988 (2017); Rowley, 458 U.S. at 206-07; M.C. v. Central Regional School, 81 F.3d 389 (3d Cir. 1996); Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171 (3d Cir. 1988); Board of Education v. Diamond, 808 F.2d 987 (3d Cir. 1986). The mechanism employed to achieve this objective is the requirement that students have an IEP. See 20 U.S.C. § 1412(4). A FAPE must also be provided "under public supervision and direction, ... meet the standards of the State educational agency, ... include an appropriate preschool, elementary school, or secondary school education in the State involved … [and must be provided at] no cost to Parents." Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 524-25 (2007) (citing 20 U.S.C. § 1401(9) and (29)). IDEA and the regulations thereunder, 34 C.F.R. § 300.100 et seq., and 22 Pa. Code Chapter 14, require that public school districts provide disabled children with a FAPE, and ensure extensive Due Process procedures to effectuate that right.

### A.  **Child-Fund**

49.   The requirement that School Districts properly locate, identify, and evaluate children with disabilities who need special education and related services and accommodations is known as "Child Find" and is expressly mandated under both IDEA and Section 504 of the

Rehabilitation Act and their implementing state and federal regulations.[6] 34 C.F.R. §§ 104.33 and 300.111; 20 U.S.C § 1412(a)(3)(A) and (B); 22 Pa. Code §§ 14.121-14.125. See PARC v. Cmwlth., 343 F. Supp. 279 (E.D. Pa. 1972).

50.     Under these statutes and their regulations, School Districts have a continuing obligation to properly evaluate and accurately identify all students who are reasonably suspected of having a disability. Ridley Sch. Dist. v. M.R., 680 F.3d. 260 (3d Cir. 2012) (citing P.P v. West Chester Sch. Dist., supra); Punxsutawney Area School District v. Kanouff, 633 A.2d 831 (Pa. Cmwlth. 1995); Ridgewood Board of Education v. N.E., 172 F.3d 238 (3d Cir. 1999); W.B. v. Matula, 67 F.3d 484 (3d Cir. (1995), abrogated on other grounds, A.W. v. Jersey City Public Schools, 486 F.3d 791 (3rd Cir. 2007); Palmyra Board of Education v. F.C., 2 F.Supp.2d 637 (D.N.J. 1998); T.B. v. School District of Philadelphia, 1997 WL 786448 (E.D.Pa. 1997).

51.     Under the IDEA's "child find" requirement, a District has a "continuing obligation ... to identify and evaluate all students who are reasonably suspected of having a disability." Section 504 imposes a similar obligation. 34 C.F.R. § 104.32; See P.P. v. West Chester Area School District, 585 F.3d 727 (3d Cir. 2009). School districts must undertake their child find duties within a reasonable time after having notice that a child may have a disability. D.K., 696 F.3d at 249. The District, with its resources and educational tools, is required to assess a child "in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor

_____

[6] Section 504 prohibits the exclusion of, or discrimination against, handicapped persons in federally funded programs such as public education. Section 504 and its regulations require the identification of all disabled children and the provision of appropriate educational services. 29 U.S.C.§ 794; 34 C.F.R. § 104.1 et seq. Failure to provide accommodations, supplemental services and FAPE constitutes unlawful discrimination for purposes of Section 504.

abilities[.]" 34 C.F.R. § 304(c)(4); see also 20 U.S.C. § 1414(b)(3)(B).

52.     A district's Child Find obligations are triggered when there is a reason to suspect that the child may be disabled; "a poorly designed and ineffective round of testing does not satisfy a school's Child Find obligation." D.K. v. Abington Sch Dist., 696 F.3d 233, 250 (3d Cir. 2012) (citing G.D. ex rel. G.D. v. Wissahickon Sch. Dist., 832 F.Supp.2d 455, 465-67 (E.D. Pa. 2011) (finding the school's reevaluation of an elementary student with significant behavioral problems was inadequate because it overemphasized academic proficiency and assessed behavioral issues only cursorily)). This duty also applies where there is reason to suspect a child with a disability may have another disability requiring more services. School Board of City of Norfolk v. Brown ex rel. R.P., 769 F.Supp.2d 928 (E.D. Va. 2010) (district failed in child find duties, both procedural and substantive, where it failed to consider possible behavioral needs of student with other disabilities).

53.     A LEA is deemed to have knowledge that the child may suffer from a disability where (1) "the parent of the child has expressed concern in writing to supervisory or administrative personnel of the appropriate educational agency, or a teacher of the child, that the child is in need of special education and related services;" (2) "the parent of the child has requested an evaluation of the child pursuant to section 1414(a)(1)(B);" or (3) "the teacher of the child, or other personnel of the [LEA], has expressed specific concerns about a pattern of behavior demonstrated by the child, directly to the director of special education of such agency or to other supervisory personnel of the agency." 20 U.S.C. § 1415(k)(5)(B).

54.     The Third Circuit has specifically found that "a child's entitlement to special education ***should not depend upon the vigilance of the parents***." M.C., 81 F.3d at 397 (emphasis added).

**B.  Evaluations**

55.     IDEA evaluations must meet the procedural requirements set out in the regulations at 34 C.F.R. §§ 300.301 - 300.311. These regulations require school districts to use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic data about the child in all areas of unique need, including information provided by the parent.

56.     For an evaluation to be considered appropriate, the District must ensure each child is assessed in all areas related to the suspected disability. The report must be "sufficiently comprehensive to identify all of the child's special education and related service needs" and provide "relevant information that directly assists" in determining the child's educational needs. 34 C.F.R. §§ 300.304(c)(1) (ii-iv), (2), (4), (6), (7). Failure to conduct a comprehensive evaluation is a procedural *and* substantive violation. <u>D.K.</u>, 696 F.3d at 250 (a poorly designed and ineffective evaluation does not satisfy child-find obligations). Therefore, an evaluation must be sufficiently comprehensive to assess all the child's suspected disabilities. 20 U.S.C. § 1414(b)(3)(B); 34 C.F.R. § 300.304(c)(4), (6).[7]

57.     The assessment of a suspected disability should include measures, if appropriate, of health, vision, hearing, social and emotional status, general intelligence, academic performance, achievement testing, communication skills, and motor abilities. 34 C.F.R. § 300.304 (c)(4). The evaluation or reevaluation report must include all existing evaluation data, classroom observations, and information provided by the parent. 34 C.F.R. § 300.305.

58.     A child's initial evaluation or reevaluation consists of two steps. First, the child's

_____

[7] Evaluation requirements under Section 504 and the state regulations contained within Chapter 15 parallel IDEA, in that complete and multiple data sources are expected, and *a team approach is required*. 34 C.F.R. § 104.35; 34 C.F.R. §104.34; 22 Pa. Code §§ 15.5, 15.6 (emphasis supplied).

evaluators must "review existing evaluation data on the child," including any evaluations and information provided by the child's parents, current assessments and classroom-based observations, and observations by teachers and other service providers. 34 C.F.R. § 300.305(a)(1). Second, based on their review of that existing data, including input from the child's parents, the *evaluation team* must "identify what additional data, if any, are needed" to assess whether the child has a qualifying disability and, if so, "administer such assessments and other evaluation measures as may be needed." 34 C.F.R. § 300.305(a)(2), (c).

59.     A District's failure to consider relevant information about the student's needs or individual circumstances in making an eligibility determination can result in a denial of FAPE. Lauren G., 906 F.Supp.2d 375.

### C. Multi-Disciplinary Team, Meaningful Parental Participation, and Procedural Safeguards

60.     IDEA requires that once an evaluation is completed, a group of qualified professionals and the child's parents determine whether he/she is a "child with a disability" and examine his/her educational needs. 34 C.F.R. § 300.306(a)(1).

61.     The regulations further require that the team, a group, be involved in determining the presence of a learning disability. 34 C.F.R. §§ 300.8, 300.309. This team approach is echoed in the Chapter 15 regulations. 22 Pa. Code §§ 15.1-15.11; Perrin ex rel. J.P. v. Warrior Run School Dist., 2015 WL 6746306 (M.D. Pa., Sept. 16, 2015) (Report and Recommendation of Carlson, M.J.), approved and adopted, 2015 WL 6746227 (M.D. Pa., Nov. 4, 2015) (Brann, J.).

62.     IDEA also requires that parents be provided meaningful participation in the process. 34 C.F.R. § 300.322; Deal v. Hamilton County Board of Education, 392 F. 3d 840 (6th Cir. 2004); Stepp ex rel. M.S. v Midd West Sch. Dist. (J.G.), 2015 WL 758302 (M.D. Pa. Feb. 23,

2015) (Schwab, U.S.M.J.); J.D. v. Kanawha County Bd. of Educ., 517 F.Supp.2d 822 (S.D.W.V. 2007).

### D. Meaningful Educational Benefit Means Appropriately Ambitious in All Relevant Domains

63.     As the Supreme Court held in Endrew F., "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F., 137 S. Ct. at 999. Creating an IEP is a "fact-intensive exercise," "informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." Id. An IEP must be judged under the particular factual circumstances of the child, and that the program must be "appropriately ambitious" in light of the child's potential. Id.

64.     Thus, the IDEA requires that a disabled student receive far more than mere trivial educational benefit. Specifically, a student's educational program must be judged by whether it involves "educational instruction 'specially designed ... to meet the unique needs of a child with a disability,' coupled with any additional 'related services' that are 'required to assist a child with a disability to benefit from [that instruction].'" Winkelman, 550 U.S. at 524, (citing 20 U.S.C. § 1401(29); § 1401(26)(A); § 1401(9)). The IEP must confer "significant learning" and "meaningful benefit" for the child; this Third Circuit test is in accord with Endrew F.'s standards. See K.D. by & through Dunn v. Downingtown Area Sch. Dist., 904 F.3d 248, 254 (3d Cir. 2018) (no conflict; in accord); L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 390 (3d Cir. 2006) ("the provision of merely more than a trivial educational benefit does not meet the meaningful benefit requirement"); T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 577 (3d Cir. 2000) ("[A] satisfactory IEP must provide significant learning and confer meaningful benefit.").

21

65.     It is also abundantly well-settled that "education" under IDEA extends beyond discrete academic skill, and includes the ***social, emotional, and physical*** progress necessary to provide the child with meaningful educational benefit, toward levels of independence and self-sufficiency consistent with the child's cognitive potential. M.C., 81 F.3d at 393-394; Ridgewood, 172 F.3d at 247; D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010); L.E., 435 F.3d at 390; Polk, 853 F.2d at 181-182; Kruelle v. New Castle County School Dist., 642 F.2d 687, 693 (3d Cir. 1981). See also Forest Grove School Dist. v. T.A., 557 U.S. 230, 239 (2009) (1997 amendments to IDEA were intended "to place greater emphasis upon improving student performance and ensuring that children with disabilities receive a quality public education.").

66.     Thus, for an IEP to be appropriate, it must offer a child the opportunity to make progress which is "meaningful" in ***all*** relevant domains under the IDEA, including academic, behavioral, social, and emotional. Robert B. v. West Chester Area School Dist., 2005 WL 2396968 at *2 (E.D. Pa. 2005) (citing S.H. v. State-Operated School Dist. of the City of Newark, 336 F.3d 260, 265 (3d Cir.2003); M.C., 81 F.3d at 394). See also Ridgewood, 172 F.3d at 247; K.R. v. School Dist. of Philadelphia, 2008 WL 2609810 at *6 (E.D. Pa. 2008).

### E.  IEP Development Duty of District's MDT

67.     The IEP is the cornerstone of the IDEA special education program for a student. Honig v. Doe, 484 U.S. 305, 311 (1988); Ridgewood, 172 F.3d at 247; W.B. v. Matula, 67 F.3d at 492; Polk, 853 F.2d at 173. The IDEA requires that every IEP include a statement of the child's present levels of academic achievement and functional performance; a statement of measurable annual goals; a description of how the child's progress toward meeting the annual goals will be measured and when periodic reports on the progress the child is making toward meeting the annual goals will be made; a statement of the special education and related services and supplementary

22

aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child or on behalf of the child; a statement of the program modifications or supports for school personnel that will be provided to enable the child to advance appropriately toward attaining the annual Goals, to be involved in and make progress in the general education curriculum; and an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in activities. 20 U.S.C. § 1414(d); 34 C.F.R. § 300.320.

68.     The IDEA provides that an IEP team, which includes both school officials and the child's parents, must develop an appropriate educational program and placement for each eligible child through an IEP. A two-pronged analysis applies in reviewing a school district's IEP development under the IDEA: (1) whether the District complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive ***meaningful*** educational benefit. Rowley, 458 U.S. at 206-207; Endrew F., 137 S. Ct. at 999; Shore Regional High School Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004); Ridgewood Bd. of Educ. v. N.E., 172 F.3d at 247; Polk, 853 F.2d at 184; Lauren W. v. DeFlaminis, 2005 WL 1353643 at *6 (E.D. Pa. June 1, 2005).

69.     It is the School District's ***non-delegable*** obligation to create an appropriate IEP. M.C., 813 F.3d at 397 ("[I]t is the responsibility of the child's teachers, therapists, and administrators – and of the multi-disciplinary team that annually evaluates the student's progress – to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly."); Carlisle Area School Dist. v. Scott P., 62 F.3d 520, 533 (3d Cir. 1995); Furhmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1035 (3d Cir. 1993); P.S., 381 F.3d at 199; Draper v. Atlanta Indep. School System, 518 F.3d 1275, 1288 (11th Cir. 2008); Jana K. v. Annville-Cleona School Dist., 39 F. Supp. 3d 584, 602 (M.D. Pa. 2014); P. v. Newington Bd. of Educ., 512 F.

Supp.2d 89, 111 (D. Conn. 2007).

### F.  Section 504

70.    Section 504 "is broader in scope [than [IDEA].... The definition of 'individual with a disability' under § 504 of the Rehabilitation Act is broader in certain respects than the definition of a 'child with [a] disabilit[y]' under the IDEA." <u>Muller v. Commission on Special Educ. of E. Islip Union Free School Dist.</u>, 145 F.3d 95, 100 n.2 (2d Cir.1998). A school may violate Section 504 independent of any violations of IDEA. <u>Lauren G. v. West Chester Area School Dist.</u>, 906 F.Supp.2d 375 (granting tuition reimbursement for School District's failure to provide FAPE under Section 504 during period of time for which no relief was granted under IDEA).

71.     For Section 504 purposes, a disabled or "handicapped person" is defined as "any person who has a physical or mental impairment which substantially limits one or more major life activities." 34 C.F.R. § 104.3. The term "physical or mental impairment" is defined as "any physical or psychological disorder such as . . . emotional or mental illness and specific learning disabilities" <u>Id.</u> The term "major life activities" is defined as "functions such as caring for one's self ... learning, and working." <u>Id.</u>

72.    Section 504 provides specific requirements for public school systems to protect all handicapped students, even those who may not qualify under the 13 categorical listings of IDEA. Section 504 requires that "a public elementary or secondary education program shall annually undertake to identify and locate every qualified handicapped person residing in the recipient's jurisdiction who is not receiving a public education and take appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty under this subpart." 34 C.F.R. § 104.32; <u>Ridgewood</u>, 172 F.3d at 253; <u>W.B. v. Matula</u>, 67 F.3d 492. The District must identify all children who are suspected of having a disability, and must also ensure that its

24

evaluations to determine actual eligibility for services occur within a reasonable time after school officials are notified of a child who is likely to have a disability. Id. at 501.

73.     To establish a violation of Section 504, a plaintiff must prove: (1) she is "disabled" as defined by Section 504; (2) she is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) she was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. Ridgewood at 253; C.G. v. Pa. Dept. of Educ., 735 F.3d 229, 235 (3d Cir. 2013); Andrew M., 490 F.3d at 350; School District of Philadelphia v. Deborah A., 422 Fed. Appx. 76 (3d Cir. 2011) (not precedential). Discrimination requires a demonstration of deliberate indifference, which may be met by establishing: (1) knowledge that a federally protected right is substantially likely to be violated, and (2) failure to act despite that knowledge. S.H. v. Lower Merion School District, 729 F.3d 248, 265 (3d Cir. 2013); J.C. v. Greenberg Salem Sch Dist., 2019 WL 3845749 (W.D. Pa. 2019).

74.     "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA. However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation, 490 F.3d 337, 350 (3d Cir. 2007).

75.     Thus, the substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA. James S. v. School Dist. of Phila., 559 F. Supp.2d 600, 620 (E.D. Pa. 2008) (citing Molly L. v. Lower Merion School Dist., 194 F. Supp.2d 422, 426 (E.D. Pa. 2002)).

76.     While IDEA governs the District's affirmative duty to provide a FAPE to disabled

students, Section 504 establishes a negative prohibition against depriving disabled students of FAPE, based upon disability. W.B. v. Matula, 67 F.3d at 492-93. The IDEA provides a remedy for "inappropriate educational placement decisions, regardless of discrimination," while Section 504 prohibits and provides a remedy for discrimination. Hornstine v. Twp. of Moorestown, 263 F. Supp. 2d 887, 901 (D.N.J. 2003) (although the student received a FAPE, the district's policy denying her valedictorian status was nonetheless discriminatory under Section 504).

77.     The District violated IDEA by failing to provide Kayla a FAPE, and thus, it also violated Section 504. A student with a disability must also be provided a FAPE under Section 504's broader standards. "Like the IEP, a § 504 Plan is the mechanism for providing a FAPE under § 504." Lauren G. v. West Chester Area School Dist., 906 F. Supp.2d 375, 391 (E.D. Pa. 2012). Cf. Breanne C. v. Southern York County School Dist., 732 F. Supp.2d 474, 478 (M.D. Pa. 2010) (Section 504 Agreement, "like an IEP, is meant to ensure that [a student with a disability] is provided with a FAPE"); accord S.M. v. School Dist. of Upper Dublin, 2011 WL 3678325 at *1 (E.D. Pa. Aug. 18, 2011).

78.     Section 504 requires schools to provide accommodations so that students with disabilities can access and benefit from regular education, and to prevent prohibited discrimination. To accomplish this, a "school district shall provide each protected handicapped student enrolled in the district, without cost to the student or family, those related aids, services or accommodations which are needed to afford the student equal opportunity to participate in and obtain the benefits of the school program and extracurricular activities without discrimination and to the maximum extent appropriate to the student's abilities." 22 Pa. Code § 15.3. The related aids, services or accommodations required by Chapter 15 are formal and are contained within a written service agreement "executed by a student's parents and a school official setting forth the specific

26

related aids, services or accommodations to be provided to a protected handicapped student." 22 Pa. Code § 15.2. Like an IEP, service agreements become operative when parents and schools agree to the written document; oral agreements are prohibited. 22 Pa. Code § 15.7(a).

79.     Like IDEA, in the context of education, Section 504 and its implementing regulations "require that school districts provide a free appropriate public education to each qualified handicapped person in its jurisdiction." Ridgewood, 172 F.3d at 253; see also Lower Merion School District v. Doe, 878 A.2d 925 (Pa. Commw. 2005); 34 C.F.R. § 104.33(a). The Third Circuit has interpreted the phrase "free appropriate public education" to require "significant learning" and "meaningful benefit". Ridgewood at 247.

80.     The primary focus of Section 504 is to "level the playing field," assuring that an individual -- specifically, a school-aged student -- is not disadvantaged in education due to a disability.

> In contrast to the IDEA, Section 504 emphasizes equal treatment, not just access to a FAPE. In other words, the drafters of Section 504 were not only concerned with [a Student] receiving a FAPE (as was the case with the IDEA), but also that a federally funded program does not treat [the Student] differently because [he/she is disabled]…Unlike the IDEA, Section 504 does not only look at what is a FAPE, but also at what is fair.

Chavez v. Tularosa Municipal Schools, 2008 WL 4816992, *14-15 (D.N.M. 2008).

81.     Under Section 504, recipients of federal funds such as the District are required to "provide a free appropriate public education [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). See Wellman v. Butler Area Sch. Dist., 877 F.3d 125, 128 n.5 (3d Cir. 2017) (explaining interrelationship of Section 504 and IDEA); Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 274 (3d Cir. 2014) (Section 504 also requires provision of FAPE). The term "appropriate

education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

82.     Under Section 504, placement procedures require a school to interpret "evaluation data and in making placement decisions, a recipient shall (1) draw upon information from a variety of sources, including aptitude and achievement tests, teacher recommendations, physical condition, social or cultural background, and adaptive behavior, (2) establish procedures to ensure that information obtained from all such sources is documented and carefully considered, (3) ensure that the placement decision is made by a group of persons, including persons knowledgeable about the child, the meaning of the evaluation data, and the placement options, and (4) ensure that the placement decision is made in conformity with 104.34." 34 C.F.R. § 104.35 (c).

### G.  Compensatory Education

83.     When a School District fails to provide FAPE, it is well-settled that equitable compensatory education is an available remedy for the student under the IDEA or Section 504. Lester H. v. Gilhool, 916 F.2d 865, 868-69 (3d Cir. 1990); Ridgewood, 172 F.3d at 250 n.11; M.C., 81 F.3d at 397. The Third Circuit has found that an appropriate remedy for a failure to provide FAPE is "the establishment of a fund to be spent on the child's education." D.F., 694 F.3d at 498. As the Third Circuit has explained:

> Under the IDEA, a "district court is authorized to grant 'such relief as the court determines is appropriate,' including attorneys' fees, reimbursement for a private educational placement, and compensatory education." A.W., 486 F.3d at 802 (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)). Compensatory education "aim[s] to place disabled children in the same position they would have occupied but for the school

28

district's violations of IDEA," by providing the educational services children should have received in the first instance. <u>Reid v. District of Columbia</u>, 401 F.3d 516, 518 (D.C. Cir. 2005). This "judicially-created remedy ... has received the imprimatur of this Court," <u>D.F. v. Collingswood Borough Bd. of Educ.</u>, 694 F.3d 488, 496 (3d Cir. 2012), and reflects the "broad discretion," <u>Bucks Cnty. Dep't of Mental Health/Mental Retardation v. Pennsylvania</u>, 379 F.3d 61, 67 (3d Cir. 2004), that Congress has granted to the courts "to remedy the deprivation of the right to a free appropriate education," <u>Carlisle Area Sch. v. Scott P.</u>, 62 F.3d 520, 536 (3d Cir. 1995).

<u>G.L. v. Ligonier Valley Sch. Dist. Auth.</u>, 802 F.3d 601, 608 (3d Cir. 2015).

84.     Compensatory education is designed to provide eligible students with the benefit of the services they should have received had the District not denied FAPE. <u>Lester H.</u>, 916 F.2d at 873 (award of compensatory education merely compensated the student for inappropriate placement, belatedly allowing student to receive the remainder of her FAPE). The amount is calculated by finding the period of deprivation of special education services and excluding the time reasonably required for the School District to rectify the problem. <u>M.C.</u>, 81 F.3d at 397.

85.     Thus, compensatory education is an in-kind remedy intended to provide educational services denied to a child by a School District's failure to provide a FAPE. <u>Lester H.</u>, 916 F.2d at 873. <u>See</u> <u>Lauren P. ex rel. David & Annmarie P. v. Wissahickon Sch. Dist.</u>, 310 Fed. Appx. 552, 554 (3d Cir. 2009) (not precedential) ("In the event that a student has been denied a FAPE, a court may award compensatory education to account for the period the student was deprived of this right. The right to a compensatory education 'accrue[s] from the point that the school district knows or should know of the IEP's failure.')" (citing and quoting <u>Scott P.</u>, 62 F.3d at 536); <u>M.P. et al., v. Campus Community School</u>, 2018 WL 4926448 (D. Del., October 10, 2018) (finding compensatory education fund appropriate, substantially increasing the amount of compensatory education by increasing the hourly rate from $17.50 to $70 per hour, and increasing the time period during which the student could use the fund for educational expenditures from four

years to eight years) (McHugh, J.); Rayna P., et al., v. Campus Community School, 2018 WL 3825893, *8 (D. Del., August 10, 2018) ("As compensation for nearly three years of FAPE denial, Rayna is entitled to one full day of compensatory education for every day she was present in school, and 2.5 hours for each day she was absent" and "this award is at the rate of $75 per hour and "the charter school is ordered to pay it within 30 days"; the court directs the charter school "to place all compensatory education funding into a third party trust" for the child "to be spent on her education.") (McHugh, J.); Montgomery Cty. Intermediate Unit No. 23 v. C.M., 2017 WL 4548022 (E.D. Pa. Oct. 12, 2017) (Bartle, J.) (compensatory education award should put students in the same position they would have occupied if the district had not violated IDEA); Norristown Area School Dist. v. Frank C., 2014 WL 11370484 (E.D. Pa. June 18, 2014) (Davis, J.) ("We agree with the Hearing Officer that Frankie's right to compensatory education accrued at the beginning of his second-grade year because, at that point, the School District knew or should have known that Frankie was unlikely to be successful in the general education classroom without one-on-one paraprofessional support."). An award of compensatory education is intended to "make whole" a child for a School District's failure to provide FAPE, even if the period of deprivation extends beyond the limitations period (which concerns only timely filing, not remedy). G.L., 802 F.3d 601.

86.     Compensatory education is an appropriate remedy when a school district knows, or should have known, that a child's educational program is not appropriate, or that she is receiving only trivial educational benefit, and the district makes a choice not to remedy the problem. M.C., 81 F.3d 389. Such an award compensates the child for the period of deprivation of special education services, excluding the time reasonably required for a school district to correct the deficiency. Id.; Reid, 401 F.3d 516. Compensatory education is an equitable remedy. Lester H. Courts and hearing officers have broad discretion in fashioning such awards. Ferren C. v. School

District of Philadelphia, 612 F.3d 712 (3d Cir. 2010).

87.     An award of full days of compensatory education is warranted where, as here, the LEA's "failure to provide specialized services permeated the student's education and resulted in a progressive and widespread decline in [the Student's] academic and emotional well-being." Jana K., 39 F. Supp. 3d at 609. See also Tyler W. ex rel. Daniel W. v. Upper Perkiomen Sch. Dist., 963 F. Supp. 2d 427, 438-39 (E.D. Pa. Aug. 6, 2013); Damian J. v. School Dist. of Phila., Civ. No. 06-3866, 2008 WL 191176, *7 n.16 (E.D. Pa. Jan. 22, 2008); Keystone Cent. Sch. Dist. v. E.E. ex rel. H.E., 438 F. Supp. 2d 519, 526 (M.D. Pa. 2006); Penn Trafford Sch. Dist. v. C.F. ex rel. M.F., Civ. No. 04-1395, 2006 WL 840334, *9 (W.D. Pa. Mar. 28, 2006). When denial of FAPE results in substantive harm, a compensatory education award must be crafted to place the student in the position that the student would be in but for the denial. However, in the absence of evidence to prove whether the type or amount of compensatory education is needed to put the student in the position that she would be in but for the denial, an hour-for-hour approach is the necessary default.

## VI.     **The Hearing Officer's Errors**

88.     Pursuant to the above standards, the District unquestionably failed in its statutory duties to Kayla. The Hearing Officer erred in ruling otherwise and in failing to award compensatory education from the start of Kayla's time in the District.

89.     Among other things, the Hearing Officer erred in failing: (1) to conclude that the District violated its child-find obligations under Forest Grove, 557 U.S. at 245 (holding child-find violation must receive a remedy); and (2) to find that the District denied FAPE to Kayla throughout her time in the District under both Section 504 and IDEA, triggering its obligation to provide compensatory education.

90.     Kayla's eligibility for classification as disabled due to her emotional and behavioral

issues is particularly compelling under Section 504, given its broader spectrum of eligibility – as well as due to how dramatically she improved when she was placed in the highly intensive DCIU special education class, with largely individual, one-on-one attention and instruction which clearly and significantly improved her achievement and conduct as compared to her time in regular education. The Hearing Officer indicated she could not determine what services should have been provided under Section 504; however, one need only look to the services that the DCIU ***actually provided*** in that "diagnostic" program. The regulations under Section 504 include special education as a service, and that is what should have been provided, by the District's own diagnosis.

91.     Further, the Hearing Officer erred in failing to find that given the overwhelmingly difficult circumstances it knew Parent was facing when she requested that Kayla be evaluated in March, and given Kayla's clear and increasing needs of which the District was aware, the District should itself have pursued due process to move ahead with an evaluation even if the parent did not return signed consent forms. Moreover, the Hearing Officer erred by failing to find Pennsylvania's process of allowing school districts to require parents who request an evaluation to sign a PTIPTE form before the district will issue a PTE for the parent to sign before they will evaluate, violates federal law by placing an additional, confusing burden or responsibility on parents to initiate an evaluation, and is unfair. A purported lack of extraordinary – and needless -- ***vigilance*** of parents must not deprive a disabled child of an appropriate education.   M.C., 81 F.3d at 397.

**A. The Hearing Officer Erred in Failing to Conclude that the District Violated its Child-Fund Duties**

92.     The Hearing Officer erred in failing to conclude that the District violated its Child-Find duties. The burden to locate and investigate for the benefit of a student with disabilities is not on the Parents.

93.     Here, Kayla's teachers had already noted her avoidance and other behaviors might be indicative of a disability. They even discussed the possibility of an evaluation in their team meetings with the vice-principal. Clearly, her declining performance, and increasing avoidance and struggles, strongly indicated that the District should have evaluated Kayla of its own accord.

94.     When, thereafter, Parent requested an evaluation in a phone call from her seriously ill son's hospital room placed by the District to inform her that, again, the District was punishing Kayla for her disabilities and suspending her once more, the District should not have placed – and should not have been vindicated by the Hearing Officer in its decision to place – additional obstacles in her way by issuing a PTIPTE form in March, then failing to send it to her until May. It should instead have immediately sent the proper, legally mandated PTE form in March. If and when the District did not receive back a signature on the form promptly from Parent, the District should have taken further steps to obtain Parent's signature, and to comply with its Child Find obligation by pursuing a due process hearing to carry out the evaluation that Parent requested. The Hearing Officer's conclusion that Parent would have refused permission for the District to carry out the evaluation that Parent requested simply because she did not return a bureaucratic form from her son's hospital room is contrary to common sense; elevates form over substance; and demands a level of *vigilance* by an overwhelmed Parent that violates the law. M.C., 81 F.3d at 397.

95.     The District acknowledged at the hearing that it expects its regular education students, such as Kayla, to make one year of growth in one year's time, and that they demonstrate proficiency with grade-level content. As a fifth-grader, Kayla had seven different teachers. She was educated in and transitioned to and from multiple classes with 20 or more students, with only one teacher for each. She was expected to use mathematical operations and apply them across content areas including science and social studies. She was assessed in math three times before

March of 2017 and sadly demonstrated that she had not grasped the presented concepts, just as the record showed was true during her fourth-grade year.

96.     Throughout Kayla's first trimester (September to November of 2016), the District had clear evidence and was admittedly aware that Kayla was struggling in many academic environments, particularly mathematics, and that it was highly unlikely she would meet the stated expectation of one year of growth in one year's time.[8] Kayla's first-trimester report card demonstrates that she completely failed to grasp math concepts, and it also shows serious concerns in reading and writing. Staff working directly with Kayla, as well as the building vice-principal, an administrator who was also responsible for special education, met regularly in a team to discuss her academic and behavioral challenges. The record completely fails to demonstrate that the District provided any support to Kayla because of these meetings, whether through response to intervention and instruction ("RTII") or multi-tiered systems of support ("MTSS").[9]

97.     During the second trimester, Kayla's academic decline continued, as reflected by her report-card grades and assessments. In math, across three separate testing opportunities, Kayla's September 2016, November 2016, and January 2017 scores (35%, 58%, and 47% respectively) are clear child-find red flags – which the District either failed to notice or ignored.

_____

[8] The District's efforts to recast Kayla's learning disability struggles as somehow related to attendance is a red herring, particularly when examining the attendance for the 2016-17 year reflecting *three* instances of her being tardy, plus *one* absence, in the first trimester. Most of her absences in the two remaining trimesters were a result of the District imposing out-of-school suspension punishments upon her.

[9] Districts are required to implement a system of screening to facilitate the identification of students for special education services. 22 Pa. Code § 14.122(a)-(c). Moreover, a District is required to refer the student for an evaluation if screening activities have produced little or no improvement within 60 school days after initiation. 22 Pa. Code § 14.122(d). Using this timeframe and the evidence of record, given Kayla's academic struggles, the District should have issued an PTE in the winter of 2016.

98.     Kayla's behavior was also a red flag. As of January 2017, the District was aware that it was increasingly meting out punishments to Kayla – including suspensions, Saturday punishment hours and exclusions from school activities – without any change in her ability to regulate her behavior or interact appropriately with staff. Kayla's behaviors in her math and reading/writing classes included avoidant sleeping, inattentiveness, defiance toward adults, and refusals to comply with directions. Teachers with actual knowledge of Kayla's performance academically and behaviorally across classrooms brought up "evaluation" in the weekly meetings attended by the administrator. Furthermore, the vice-principal, who was responsible for special education in the building, acknowledged that while she was well aware of the teachers' concerns, she was of the opinion that there was simply not "enough" to evaluate – purportedly because the very process designed to bring much needed support to Kayla was somehow arduous and not something to "put a child through." N.T. 474-475, 479.

99.     The unrefuted evidence reveals that Kayla was struggling academically in multiple environments, was experiencing behavioral issues in a way that was not responding to disciplinary measures, and that her teachers were discussing the need for an IDEA/Section 504 evaluation with the administrator in charge of special education. The IDEA mandate relating to the issuance of a PTE and the opening of the 504 process was clearly warranted, and it is also clear that by this point Kayla was a "thought-to-be-eligible" student regarding discipline issues under 34 C.F.R. § 300.534.

100.     The second trimester in the District ran from November 2016 to March 2017, and during it, Kayla's struggles increased. She repeatedly demonstrated her inability to manage and

regulate her behavior. The District imposed more and more discipline without impact, and her grades continued in a downward spiral.[10]

101.   Kayla avoided tasks by sleeping in different academic settings, and when awake, the District's psychologist noted in a classroom observation (that was not reviewed by the DCIU psychologist in her ER) that Kayla was off-task at least 48% of the time in the language arts setting. Her math teacher testified that her percentage of off-task behavior in his class was even higher. These even brighter red flags, waving more insistently and vigorously, persisted even though her teachers attempted a variety of informal, non-documented strategies. Even in the presence of clearly increased academic and behavioral struggles that impacted not only Kayla but also other students, the District and Hearing Officer, contrary to the law, did not find "enough" for the District to issue a PTE in furtherance of its affirmative obligation to Kayla under its IDEA, or Section 504, child-find duties, and did not find that Parent's hospital bedside request for an evaluation was worthy of respect or any degree of consideration other than a bureaucratic nightmare of paperwork.

102.   By the end of March 2017, the District had: A) imposed out-of-school suspensions sufficient to deny Kayla ten full days of instruction; B) removed her from instruction during the day many times to sit with a team member and/or administrator; C) imposed eight hours of Saturday punishment upon her; and D) excluded her from over 30 days of extracurricular and/or special activities. It was clear that its punitive strategy was not working to decrease, but was in fact

––––––––––––––––––––

[10] It is not possible to know the true nature of Kayla's academic struggles, particularly in math or written expression, based solely on the report cards, as the District prohibited teachers from accurately recording grades. Testimony below indicated that the District required its teachers to confer no grade lower than a 59, to maximize the possibility of matriculating to the next grade.

increasing, her struggles, but the Hearing Officer and District incredibly ignored that.

103.    Finally, following the June 8, 2017 altercation in which Kayla slapped a peer and a teacher who attempted to break up the fight, things begin to change. Immediately before the incident, Kayla's discipline status was dire: she had racked up 28 or more removals from classes during the day; 12 full days of out-of-school suspension; 24 hours of Saturday punishment; plus lunch detentions and exclusions from activities for essentially the entire school year. In contrast with an incident months earlier in which Kayla was reported to have kicked a peer -- requiring that peer to visit the school nurse -- there is and was no evidence that the teacher involved in this incident sought or needed medical attention. In fact, the teacher prepared the discipline referral that same day, and issued a two-day suspension.

104.    Oddly, however, four days after the incident, an administrator recharacterized the event as one rising to the level of a "terroristic act," although there was no evidence of any bodily injury, let alone serious bodily injury. This classification triggered potential expulsion. At that time, the District imposed an additional three days of suspension, for a total of 15 days that school year.[11] Once the administrator sent the June 12, 2017 memo to the superintendent of the District, Kayla somehow changed in the eyes of the administration.  It was only thereafter, on June 15, 2017, that the District submitted a form referring this matter to the MDT, albeit without issuing a corresponding PTE.

105.    At that time, with ten months of academic failure, 16 full days of suspension, 28 Saturday punishment hours, and countless removals from class time during the school day serving

---

[11] To the extent it is determined Kayla was a "thought-to-be-eligible" child, the legal limit of ten days of suspension was reached as of March 22, 2017.

detention and/or sitting with an administrator, plus myriad days of exclusions from extracurricular and special activities, and with expulsion in the process, the District finally wondered whether it might perhaps be time to find out if there were additional concerns. However, under no circumstances would the District permit that inquiry to occur in the middle school setting, because, as its later due process testimony proved, it would only permit Kayla to be evaluated *outside* the District. This, presumably, is why it did not issue a PTE at that time.

106.    The District's placement determination at the DCIU was essentially special education, and while it offered Kayla different and much-needed support, it also had a significant and deleterious impact on its long-overdue evaluation findings and its child-find obligation, which the District never met, contrary to the Hearing Officer's erroneous Decision.

### B.    The Hearing Officer Erred in Failing to Conclude that the District/DCIU Evaluation Was Improper, Inaccurate, and Untimely

107.    By requiring Kayla to be evaluated in the small, special-education DCIU program – and then affirmatively choosing not to participate in that process (either through producing records or communicating with the psychologist), the District guaranteed her initial evaluation would, as a matter of law, be insufficient, as it lacked any meaningful information from the recent 2016-2017 school year, when she was placed in the regular-education setting of the District's middle school. The October 2017 ER does not contain critical Chichester information including:

- Math benchmarking for 2016-17;

- Accurate grades;

- MDT referral form;

- Math strategies used unsuccessfully;

- Discipline referrals;

- The lack of impact of multiple in-school and out-of-school suspensions, Saturday punishments, in-house and lunch detentions, and the many other District punishments;

- The school psychologist's observation in the setting of the English language arts class (writing), where Kayla was off-task 48% of the time; and

- Information and/or input from the math teacher that Kayla was likely off-task in his setting more than 48% of the time, and that she demonstrated avoidance behaviors including defiance, eloping, sleeping, verbal aggression toward him and peers, despite his having attempted multiple strategies to engage her and stop such behaviors.

108.   The record shows that the DCIU evaluating psychologist received **nothing** from any of Kayla's District teachers who worked with her for ten months – nor did she make any such request.

109.   Unlike the Chichester regular school environment, at the DCIU program, Kayla was placed in a full-time **special** education setting. She received instruction from a single special education teacher in a very small setting of no more than six students with additional support in the classroom including a social worker, a classroom assistant/aide, and a student teacher – and she received one-on-one **and** group counseling. Kayla's transitions between classes at DCIU were minimal and in no way mirrored the multiple problematic transitions across the day at the regular education middle school in the District. Kayla also had the benefit of being able to leave any setting in the DCIU program to seek support from counselors who were readily available at all times, and to walk the hallways with them to decompress, while discussing her emotionality, unlike at the District's middle school, where many of her discipline infractions centered around being absent from (or leaving) class, or being in the hallways or other settings without a "pass."

110.   This environment was, as even acknowledged by the psychologist, in no way

equivalent to the Chichester setting.

111.    Even in this atypical special-education environment, Kayla's task-avoidance behavior, particularly in math – which was prevalent at Chichester – continued during instruction and classroom assessment. It was observed by the DCIU Board-Certified Behavior Analyst ("BCBA"), it occurred during the DCIU's one-on-one assessment, and a complete math assessment was not even possible during the DCIU evaluation.

112.    These observations are simply irreconcilable with the psychologist's conclusion that Kayla was not eligible under IDEA and Section 504. When considered together with the fact that this psychologist did not even possess the District's information, which demonstrates that these behaviors were far more prevalent in the larger, typical regular education environment, these factors strongly compel the conclusion that the ER was inadequate as a matter of law.

113.    On top of this, the District/DCIU ER omitted important other critical sources of information, including aspects of the actual DCIU program and crucial academic information. The following were unreviewed:

- Any aspect of the initial psychiatric report other than its diagnosis;

- DCIU one-on-one therapy and group therapy notes;

- DCIU mental health plan, including triggers and reinforcers identified by Kayla;

- The DCIU classroom math assessment (which was unable to be obtained, despite multiple attempts over days, due to Kayla's avoidant sleeping);

- A grade-level classroom assessment regarding reading comprehension, since Kayla, as a sixth-grader, was assessed using fourth-grade-level materials, without any explanation for that significant difference (which likely explained in part her higher grades at the DCIU setting than in the District); and

40

- A classroom writing sample.

114.    When such critical assessments are not performed, a complete picture of the child is foreclosed, and the evaluation is incomplete and inadequate.

115.    The October 2017 DCIU ER is equally flawed in the area of assessing Kayla's behavior, as its analysis focused only on Kayla's performance and response while in the full-time, small, and highly-staffed *special*-education setting. As noted in documents introduced at the due process hearing, Kayla was highly supported in the DCIU classroom through an intensive teacher/staff-to-student ratio, a significantly reduced learning cohort of peers, with planned reinforcers and incentives, and with group and one-on-one counseling. This program in no way reflected the District's regular-education environment in which Kayla clearly struggled, which led to the evaluation, and to which, ironically, Kayla was scheduled to be returned, given the non-eligibility determination (and did return, albeit in a different public school district). To give just one small example, the 2018 ER found Kayla was "at risk" for somatization and withdrawal; however, those findings are grossly incomplete, because the DCIU report did not discuss Kayla's 2016-17 ten trips to the nurse, or the rest of the District records; the DCIU psychologist did not even request them. Even the DCIU teacher's comment that Kayla exhibited two of four flags for depression entirely ignores the District's history, in which she exhibited more flags and signs.

116.    Similarly, without Kayla's complete 2016-2017 discipline history from the District, her DCIU teacher's report to the DCIU psychologist that Kayla was in the "at risk" range for social skills, and had highly elevated scores in peer relations, oppositional defiance, conduct disorder, and impulsivity, lack the context and history that is critical to an appropriate IDEA/Section 504 evaluation.

117.    The District's/DCIU's October 12, 2017 ER stated that Kayla's mother requested

the evaluation to determine the need for special education services, but it fails to clearly note that she requested that evaluation some *seven months previously*. When Kayla entered the DCIU program, its psychiatrist, Jessica Adler, M.D., performed a psychiatric evaluation, the report of which is dated September 6, 2017. That psychiatric evaluation, merely summarized in the October 2017 ER, diagnosed Kayla with Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, and possible Attention Deficit Hyperactivity Disorder ("ADHD"). The ER does not appropriately analyze these diagnoses in the context of IDEA or Section 504 support for Kayla.

118.    Oddly, although the District acknowledged that mental health diagnoses must be considered through Section 504, its and the DCIU's ER ignored the fact that the DCIU psychiatrist diagnosed Kayla with Adjustment Disorder with Mixed Disturbance of Emotion and Conduct. It is even more incredible that the DCIU psychologist both acknowledged the accuracy of that psychiatrist's diagnosis and yet *declined* to find Kayla eligible under Section 504, inexplicably stating that "student did not qualify due to currently not having a reported disability." Exhibit 1 at 23.

119.    That is utterly contrary to Section 504. Given the psychiatric diagnosis, plus Kayla's previously documented academic and behavioral history, there can be no doubt that Kayla is and was qualified as a protected disabled/handicapped student under Section 504.

120.    The ER included a twenty-six minute classroom observation in Kayla's self-contained special education classroom at the DCIU; however, it only specified that this was during a "paper and pencil task." It is unclear what type of academic task Kayla was working on, whether it was grade-level content, and how she performed on that task. No further classroom observation was undertaken as part of the 2017 ER.

121.    The October 2017 ER included a cognitive assessment using the fourth edition of

the Woodcock-Johnson Tests of Cognitive Abilities (WJ-IV), with generally average cognitive functioning scores. The Kaufman Assessment Battery for Children — Second Edition ("KABC-II") was also used to gain further information about Kayla's verbal abilities and reflected a below-average score in expressive vocabulary.

122.    The ER included academic achievement scores, measured using the WJ-IV Achievement assessment, and also reflected overall average achievement scores.

123.    Despite these overall average achievement scores as measured when she was at the DCIU in the 2017-2018 school year, Kayla failed the majority of her academic courses while she was at the District during the 2016-2017 school year. Additionally, curriculum-based measures included in the ER, such as the Group Reading Assessment and Diagnostic Evaluation ("GRADE"), show that Kayla, at the time in sixth grade, was assessed using *fourth-grade materials* for vocabulary and comprehension. Lastly, the psychologist attempted to administer the Group Mathematics Assessment and Diagnostic Evaluation ("GMADE"), but, after four attempts, she gave up and reported that it could not be completed, because Kayla was utilizing her avoidance strategy of sleeping. Further, as noted, her Spring 2017 PSSA math scores were in the "Below Basic" (lowest) range.

124.    The October 2017 ER only included one assessment for Speech and Language, and on it, the fifth edition of the Clinical Evaluation of Language Fundamentals screening test ("CELF-5"), Kayla's overall score of twenty-two, supposedly seven points above the criterion, was the basis of the DCIU's psychologist's decision to perform no further assessments – even though Kayla also had a "Below Average" score in Expressive Vocabulary using the KABC-II.

125.    The October 2017 ER also included the second edition of the Developmental NEuroPSYchological Assessment ("NEPSY-2") Auditory Attention and Response Set, on which

Kayla's scores were "Well Below Expected Levels" in Inhibitory Errors. The psychologist utilized the Conners-3 to measure Kayla's attention skills and characteristics, per the possible ADHD diagnosis of the psychiatrist. Kayla's mother reported "High Average" scores in ADHD and executive functioning. Even her DCIU special-education teacher reported a "Very Elevated" score in peer relations; "Somewhat Elevated" scores in inattention and executive functioning; and "High Average" scores in hyperactivity/impulsivity and defiance/aggression.

126.    The psychologist had Kayla's mother and DCIU teacher complete BASC-3 rating scales to determine her social/emotional functioning. Kayla's DCIU teacher reported "At-Risk" scores in somatization and withdrawal, and her mother reported "At-Risk" scores in attention problems and adaptability.

127.    Although the DCIU completed a functional behavior assessment ("FBA") as part of the October 12, 2017 ER, the evaluator wrote: "No interfering behaviors were observed during the FBA." However, the evaluator observed Kayla yelling out an answer and, during two out of three observations, Kayla fell asleep during instructional time, thus failing to complete tasks.

128.    The October 2017 ER concluded Kayla did not qualify for an IEP or Section 504 plan. The report ruled out a Specific Learning Disability ("SLD"), as her achievement scores were purportedly – but not fully accurately – in line with cognitive ability, and concluded that because she was not medically diagnosed with ADHD, she did not have an Other Health Impairment ("OHI"). Ironically, relying on the features of the DCIU program while denying a need for special education, the ER described Kayla's successful DCIU program as including built-in special education and related services such as: individual counseling; group counseling; and a high level of instruction from a special education teacher.

129.    Although the District placed Kayla, a *regular* education student, in a DCIU *special*

education setting, and she did much better there, the District incredibly concluded that Kayla was not a special education student in need of SDI under IDEA *or* in need of Section 504 supports. The ER further opined that in spite of its finding her not eligible, the District should continue counseling (a Related Service).

130.    In sum, the District's evaluation was improper, inaccurate, and untimely. The Hearing Officer erred in finding otherwise.

**C.    The Hearing Officer Erred in Failing to Conclude that the District's Eligibility Process was Erroneous**

131.    The District's process to address eligibility was equally flawed.  This "process" lacked the team review that IDEA /Section 504 regulations required. Quite simply, there was no process. Instead, there was a single psychologist, without a complete record, whose decisions were summarily adopted.

132.    Based on the testimony, it is highly likely that even if the District had convened the required meeting, the outcome would still have been be the same, since, as the District clearly acknowledged, it had no role in Kayla's eligibility determination, only the DCIU. The District's Director of Pupil Services testified that [the] "school psychologist is the one that's the expert and that's gonna look at all the avenues. They're the ones who's ultimately deciding if that child is in need of additional services. So I stand by the evaluation that was done by DCIU. …. [I]'m not the psychologist. [S]he had the reasons for not making her eligible. So, I don't have any concerns with what the report said." The DCIU psychologist testified that students deemed non-eligible do not, as a matter of policy/practice, receive the contemplated team meeting: "typically when they don't qualify, I usually will touch base with the parent and the District has a copy of the report. The District usually doesn't participate in the meeting if they don't qualify."

133.     There was no evidence that Parent promptly received the report, or even a perfunctory telephone call, after the report was finished. It is unrefuted that the only delivery of the report was in December 2017 via email from the head of the DCIU full-time program. The District, however, acknowledged receiving the report in October 2017, then failing to share it with the Parent, any other Chichester middle-school team teacher or administrator, or to continue the process, including issuing a NOREP with a formal non-eligibility finding. These affirmative actions foreclosed Parent's participation in the IDEA/Section 504 process, and, as a result, again foreclosed the opportunity for a voice to speak on Kayla's behalf.

134.     With the single-voiced non-eligibility ER concluded, the District's decision not to convene a meeting of the team resulted in silence, contrary to IDEA's mandate that multiple voices gather to discuss and determine eligibility. By so deciding, the District violated IDEA and Section 504, and it foreclosed the opportunity for staff with knowledge of Kayla and her experience with the regular education environment and curriculum, as well as her mother, to engage in the process. Its foreclosure in this regard was exacerbated by its previous failure to transmit complete District information to the DCIU.

135.     The 2017-18 school year opened for students on September 5, 2017. As a result, Kayla's evaluation period concluded November 5, 2017. As of that date, there had been no meeting.  The District never issued a NOREP or Safeguards, despite the requirements of 34 C.F.R. §§ 300.503-504.

### D.     Section 504 – Discipline & Exclusions

136.     A school district is required to ensure that protected handicapped students have an *equal opportunity to participate in the school program and extracurricular activities to the maximum extent appropriate* through the use and provision of aids, services, and

accommodations. Here, for months and months, equating to an entire school year, the District failed to live up to these responsibilities. Further, it imposed excessively punitive measures and continued that well after it was clear that they not only did not assist in reducing Kayla's problematic behaviors but actually exacerbated and increased them – and long after her demonstrated needs should have qualified her as a "thought-to-be-eligible" student.

137.    The District did not consider whether the behaviors that Kayla was exhibiting -- including frequent avoidance by sleeping, eloping, visits to the school nurse, defiance and verbal aggression toward staff, and verbal and physical aggression toward peers – might well indicate a disability/handicap under Section 504, as it did. Instead, the District provided Kayla with only unrelenting punishment. Further, it was apparently not interested in ascertaining her diagnosis, which the DCIU psychiatrist made mere 22 calendar days from the date on which the District met to potentially expel her, which was the *second* school day of the 2017-18 school year.

138.    Regardless of what impact (if any) her tragic family circumstances had on Kayla's in-school behavior, the facts are plain. Kayla's behaviors interfered with her learning and that of others. Within 48 hours of being "evaluated," she was identified with a condition that explains the behavioral challenges she exhibited throughout the 2016-2017 school year. The District made no effort to find out why Kayla exhibited those behaviors. It did not attempt to support her, apart from ongoing disciplinary punishments. Although it ultimately decided to evaluate her, it did so in such a way as to prohibit Kayla from returning to the regular education setting, placing her in an environment that in no way resembled that setting. It then elected not to participate in the evaluation and eligibility processes.

139.    Plainly, the District acted with deliberate indifference, in violation of Section 504. J. C. v. Greenburg Salem School Dist., 2019 WL 3845749 (W.D. Pa. 2019). The Hearing Officer's

conclusion otherwise was an illegal and unwarranted free pass for the District.

140.     Kayla is a student who, at all times relevant to this Complaint, is and was disabled, and is and was otherwise qualified to participate in, and receive equal benefits from, the Defendant's educational programs with appropriate instruction, accommodations and supplemental supports for purposes of Section 504.

141.     Defendant's failure to offer Kayla a non-discriminatory, appropriate educational environment resulted in her being excluded from participation in, denied the benefits of, or subject to discrimination in, her education. The evidence established that the District violated Section 504 by neglecting its child-find duties, by failing to evaluate Kayla appropriately and in a timely fashion, by subjecting her to serial discipline including increasingly lengthy exclusion from school and school-based activities, and in failing to provide or offer Kayla an appropriate program that meaningfully addressed her disabilities, all of which denied her a meaningful educational benefit. The Hearing Officer therefore erred in not finding a violation of Section 504.

####     E.     Compensatory Education

142.     The District withheld all of the mandated processes and safeguards required of schools to identify students in a timely and comprehensive manner and to respond to challenges they exhibit, all the procedures designed to bring voices to the table including parents, in service of the objectives of public education, to prepare students for independence and to reach her or his individual potential. Kayla will now move forward on a different path as she will be provided with the support and services she needs. She needed those supports and services in 2016-2017 and the first part of 2017-2018. Contrary to the Hearing Officer's Decision, the record in this case clearly demonstrates that the District initially withheld the processes designed to ensure support was provided, and once those processes were undertaken, albeit reluctantly and off-site, in a

completely different environment, they were woefully inadequate and lacked mandated, necessary and vital components.

**VII.**   **Additional Relief**

143.    Section 504 and the IDEA permit recovery of reasonable attorneys' fees by parents who prevail in an action or proceeding thereunder. 20 U.S.C. 1415 § 615 (i)(3)(B); 34 C.F.R. § 300.517; 29 U.S.C. § 794a; Andrew M. v. Delaware County Office of Mental Health/Mental Retardation, 2005 WL 783070 at *15 (E.D. Pa. 2005) (attorneys' fees are recoverable under Section 504); Daniel S. v. Scranton School Dist., 230 F.3d 90, 95 (3d Cir. 2000) (attorneys' fees are recoverable under IDEA).

144.    Plaintiffs expect to be the prevailing parties at the conclusion of these proceedings and are thus eligible for an award of reasonable attorneys' fees and costs, including expert costs.

## CONCLUSION

**WHEREFORE**, the Plaintiffs respectfully request that this Court:

1.    Assume jurisdiction over this action;

2.    Hear or receive additional evidence as needed, pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii);

3.    Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, and Pennsylvania law;

4.    Reverse the Hearing Officer's Decision to the extent it finds that the Family is not entitled to compensatory education for the entire period during which Kayla attended school in the District;

5.    Order the Defendant to pay Plaintiffs their reasonable attorneys' fees and related costs; and

6.    Grant such other relief as this Court deems proper.

Respectfully submitted,

John W. Goldsborough, Esquire
ID No. 73063

Kimberly A. Caputo, Esquire
ID No. 56993

Dennis C. McAndrews, Esquire
ID No. 28012

McANDREWS, MEHALICK, CONNOLLY,
HULSE AND RYAN, P.C.
30 Cassatt Avenue
Berwyn, PA
(610) 648-9300 (phone)
(610) 648-0433 (fax)
Attorneys for Plaintiffs